UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STANLEY WILLIAM HARRISON,

      Petitioner,

v.

SHIRLEY HARRY,

      Respondent.

Case No. 17-13692
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

---

In the fall of 2013, Shandar Turner was stabbed to death in front of her four-year-old twins. The twins identified Petitioner Stanley William Harrison as the person who killed their mother, stating so to a neighbor who ran to help and to two police officers who arrived on the scene. Based on this and other evidence, a jury convicted Harrison of first degree murder and sentenced him to life in prison.

Harrison appealed without success. He now seeks a writ of habeas corpus from this Court. He raises six claims, but all are barred by § 2254(d) or § 2254(e)(1) or otherwise lack merit. Harrison's petition therefore will be denied.

## I. PROCEDURAL HISTORY

### A.

The Court accepts the facts as found by the Michigan Court of Appeals unless the factual findings are unreasonable, 28 U.S.C. § 2254(d)(2), or are rebutted by clear and convincing evidence, 28 U.S.C. § 2254(e)(1). The Michigan Court of Appeals recounted the evidence presented at Harrison's trial:

> On September 27, 2013, defendant stabbed Shandar Turner to death in front of her four-year-old twins. After hearing the children begging for their mother not to die, a neighbor, Teala Stevens, ran down stairs and to the victim, who was lying in the yard with her sons standing over her. The victim asked Stevens to take her twins into her home and call 911. Emergency medical services personnel arrived shortly thereafter, performed on-scene medical attention, and took the victim to the hospital, where she later died. According to the medical examiner, the victim was stabbed eleven times, and a stab wound through her lungs caused her death, which was determined to be a homicide.  The four-year-old twins identified defendant, who was referred to as "Daddy Stanley," as the person who stabbed their mother.

*People v. Harrison*, No. 327708, 2016 WL 5328694, at *1 (Mich. Ct. App. Sept. 22, 2016). (The Michigan Court of Appeals added a footnote to clarify that Harrison was not the children's biological father. Harrison viewed himself as a father figure to the boys.) A jury convicted Harrison of first degree murder, Mich. Comp. Laws § 750.316(1)(a), and he was sentenced to life in prison. *Harrison*, 2016 WL 5328694, at *1.

Harrison appealed, raising the same six grounds of appeal that he asserts now in this federal habeas proceeding. *People v. Harrison*, No. 327708, 2016 WL 5328694, at *1 (Mich. Ct. App. Sept. 22, 2016) (*See also* ECF No. 15-13.) His conviction was affirmed on appeal. *Id.* The Michigan Supreme Court then denied leave to appeal. *People v. Harrison*, 891 N.W. 2d 492 (2017).

## B.

Harrison then sought relief in federal court by filing a petition for a writ of habeas corpus. (ECF No. 1, PageID.5.) After an initial round of briefing, this Court allowed Harrison to file an amended petition. (ECF No. 16.) The amended petition raises the same grounds with additional briefing. (*See id.*) The Warden advised the Court that she would continue to rely on her original response. (*See* ECF Nos. 14, 18.) Harrison has since filed two supplemental authorities and a document titled "Evidence supporting supplemental authority." (ECF Nos. 22, 24, 25.)

Harrison raises six claims challenging his conviction: (1) the trial court denied Harrison a fair trial by admitting inadmissible hearsay statements by non-testifying witnesses; (2) the trial court denied Harrison a fair trial by admitting an involuntary statement after he invoked the right to remain silent and then involuntarily waived that right, and his attorney's failure to move to suppress the statement constituted ineffective assistance of counsel; (3) the trial court denied Harrison a fair trial by admitting, over objection, evidence that Harrison had been released from prison a few days before the offense; (4) the prosecutor denied Harrison a fair trial by making improper arguments during trial, and his attorney's failure to object constituted ineffective assistance of counsel; (5) that he was denied due process when the trial court denied his motion to quash the bindover order and dismiss the charging information at the outset of his case because the testimony of the twin boys at the preliminary examination was insufficient evidence, and that his trial counsel was ineffective for failing to pursue an interlocutory appeal on that basis; and (6) the trial court abused its discretion when it denied his motion for a new trial and motion for DNA testing. (*See* ECF No. 16)

The Court will deny the petition because the claims are without merit. The Court will also deny Harrison a certificate of appealability.

## II.   PROCEDURAL DEFAULT

As a preliminary matter, the Warden argues that Harrison's second and fourth claims are procedurally defaulted because Harrison failed to object at trial. Harrison counters that his trial counsel was ineffective for failing to object.

Ineffective assistance of counsel may establish good cause to excuse a procedural default. *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000). And this Court has the discretion to deny a habeas claim on the merits even if the claim may be procedurally defaulted or unexhausted. *See*

*Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). In this case, judicial economy favors resolving Harrison's claims on the merits rather than delving into complicated questions of procedural default and exhaustion. *See, e.g.*, *Helms v. Bowerman*, 785 F. App'x 274, 279 (6th Cir. 2019) (proceeding to the merits of a habeas claim because "the procedural-default issue here is complicated and unnecessary to the disposition of this case.").

### III.  LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act (AEDPA) "confirm[s]" under 28 U.S.C. § 2254 "that state courts are the principal forum for asserting constitutional challenges to state convictions." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). If a claim was "adjudicated on the merits in State court proceedings," this Court cannot grant habeas corpus relief on the basis of that claim "unless the adjudication of the claim . . . resulted in a decision" (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d). But if state courts did not adjudicate a claim "on the merits," this "'AEDPA deference' does not apply and [this Court] will review the claim de novo." *Bies v. Sheldon*, 775 F.3d 386, 395 (6th Cir. 2014).

### IV.  ANALYSIS

There is no dispute in this case that the state courts adjudicated all of Harrison's claims "on the merits" as that phrase is used in § 2254(d). (The Michigan Court of Appeals reviewed Harrison's second and fourth claims for plain error, *see People v. Harrison*, No. 327708, 2016 WL 5328694, at *5, *7 (Mich. Ct. App. Sept. 22, 2016), which still counts as an "on the merits"

determination, *see Stewart v. Trierweiler*, 867 F.3d 633, 638 (6th Cir. 2017)). The Court accordingly cannot grant habeas relief unless the state court issued a decision in Harrison's case that was either contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States, or based on an unreasonable determination of the facts in light of the evidence. With that in mind, the Court turns to Harrison's six claims for relief.

### A.  Hearsay

Harrison argues that the trial court violated his Sixth Amendment right to confront those testifying against him by admitting impermissible hearsay statements at four different times. Under the excited utterance exception, the trial court admitted recorded and unrecorded statements by Turner's 4-year-old twins, made to a neighbor and to two police officers soon after their mother was attacked. Although the twins testified at the preliminary examination, they did not testify at trial. Harrison also argues that the trial court improperly admitted the recording of a 911 call to police from Turner's neighbor, who called for help shortly after the attack.

As a general rule, it is "not the province of a federal habeas court to reexamine state-court determinations on state-court questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). On federal habeas review, errors in the application of state law, especially rulings regarding the admissibility of evidence, are usually not cognizable. *Seymour v. Walker,* 224 F.3d 542, 552 (6th Cir. 2000). The admissibility of evidence under Michigan's hearsay rules is not cognizable in a habeas corpus proceeding. *See Byrd v. Tessmer*, 82 F. App'x 147, 150 (6th Cir. 2003).  Thus, Harrison's claim that the trial court improperly admitted the twins' out-of-court statements under the excited utterance exception to the Michigan hearsay rule presents a state evidentiary law issue

5

which is not cognizable on federal habeas review. *See, e.g.*, *Smith v. Jones*, 326 F. App'x 324, 330 (6th Cir. 2009); *see also Williams v. White*, 183 F. Supp. 2d 969, 975–77 (E.D. Mich. 2002).

The Court will, however, address Harrison's claims under the Confrontation Clause.

### 1. Statements to the Neighbor

Petitioner first claims that his Sixth Amendment right to confrontation was violated by the admission of the twins' statements to their neighbor, Teala Stevens: "My daddy—Daddy Stanley killed my mom—mommy, because she didn't love him anymore."

The Michigan Court of Appeals rejected Harrison's claim:

> [T]here is . . . no violation of defendant's confrontation rights because the statement to Stevens was nontestimonial in nature. It was made to a neighbor, not law enforcement personnel, immediately after a brutal stabbing while the victim was bleeding to death. These circumstances reflect a statement made during an ongoing emergency, not to assist in a potential prosecution.

*People v. Harrison*, 2016 WL 5328694, at *2.

Out-of-court statements that are testimonial in nature are barred by the Sixth Amendment Confrontation Clause unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness, regardless of whether such statements are deemed reliable by the court. *See Crawford v. Washington,* 541 U.S. 36 (2004). But the Confrontation Clause is not even implicated, and need not be considered, when non-testimonial hearsay is at issue. *See Davis v. Washington*, 547 U. S. 813, 823–26 (2006); *see also Desai v. Booker*, 538 F.3d 424, 425–26 (6th Cir. 2008). Remarks made to family members or acquaintances are not testimonial. *Crawford,* 541 U.S. at 51–52, 56. As the Supreme Court has explained:

> The text of the Confrontation Clause reflects this focus [on testimonial hearsay]. It applies to 'witnesses' against the accused-in other words, those who 'bear testimony.' 1 N. Webster, *An American Dictionary of the English Language* (1828). 'Testimony,' in turn, is typically 'a solemn declaration or affirmation made for the purpose of establishing or proving some fact.' *Ibid.* An accuser who makes a

formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.

*Davis,* 547 U.S. at 823–24 (quoting *Crawford*, 541 U.S. at 51).

It was not contrary to or an unreasonable application of *Crawford* or *Davis* for the Michigan Court of Appeals to find that the twins' statements to Stevens were not testimonial statements subject to the Confrontation Clause. *See* 28 U.S.C. § 2254(d). The twins' remarks were made to a friend or acquaintance and not made to law enforcement. *See Deshai*, 538 F. 3d at 427. And because the Confrontation Clause does not apply to non-testimonial statements, a court may admit non-testimonial statements even if they lack indicia of reliability. *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007). The Michigan Court of Appeals reasonably rejected this portion of Harrison's claim.

### 2. Statements to Law Enforcement

Harrison argues that the trial court violated his Sixth Amendment right to confrontation when it admitted three statements made to law enforcement. The trial court admitted a 911 call by Stevens, after the twins called her for help and she ran to the scene of the stabbing. The Michigan Court of Appeals concluded that Stevens' 911 call was nontestimonial because it was made to report an ongoing emergency. *People v. Harrison,* 2016 WL 5328694, at *4.

The trial court also admitted the twins' statements to two law enforcement officers. At the scene, when Detective Teets asked them whether "Stanley Jackson" killed their mother, the twins identified Harrison, known to them as "Daddy Stanley," as the person who killed her. The trial court also admitted the twins' statements at the scene to Deputy Hause, when they stated, gesturing, "he did like that" or "he had a knife and he did like that." The Michigan Court of Appeals ruled that these admissions did not violate the Sixth Amendment because the twins' statements were

made in response to an ongoing emergency and not with the intent to aid a subsequent prosecution. *People v. Harrison*, 2016 WL 5328694, at *2–3.

Statements taken by police officers in the course of police questioning "under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency" are "nontestimonial" and not subject to the Confrontation Clause. *Davis*, 547 U.S. at 822. By contrast, statements are testimonial and subject to the Confrontation Clause "when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.*

In *Davis*, the Supreme Court held that statements made by a domestic abuse victim in response to a 911 operator's questions while the defendant was inside her home in violation of a no-contact order, in which the victim identified her assailant, were not "testimonial" and therefore not subject to Confrontation Clause. *Id.* at 826–28. The Supreme Court reasoned that the victim was speaking about events as they were actually happening, rather than describing past events, and the primary purpose of the 911 operator's interrogation was to enable police assistance to meet an ongoing emergency caused by a physical threat to the victim. *Id.* "[A] 911 call . . . and at least the initial interrogation conducted in connection with a 911 call, is ordinarily not designed primarily to "establis[h] or prov[e]" some past fact, but to describe current circumstances requiring police assistance." *Id.* at 827.

Harrison argues that his case is not like *Davis*. He maintains that the ongoing emergency exception does not apply to the twins' statements to Detective Teets and Deputy Hause because the ongoing emergency had ended once the twins were taken into Stevens' residence and the police had arrived.

8

The Michigan Court of Appeals considered and rejected this argument. It reasoned that "the United States Supreme Court has expressly rejected such an unduly narrow understanding of 'ongoing emergency.'" *People v. Harrison*, 2016 WL 5328694, at *3 (citing *Michigan v. Bryant*, 562 U.S. 344, 362 (2011)).

That was not contrary to or an unreasonable application of any Supreme Court precedent. The Supreme Court explained in *Bryant*:

> The existence of an ongoing emergency must be objectively assessed from the perspective of the parties to the interrogation at the time, not with the benefit of hindsight. If the information the parties knew at the time of the encounter would lead a reasonable person to believe that there was an emergency, even if that belief was later proved incorrect, that is sufficient for purposes of the Confrontation Clause. The emergency is relevant to the "primary purpose of the interrogation" because of the effect it has on the parties' purpose, not because of its actual existence.

562 U.S. 344, 361, n.8 (2011). That determination is "a highly context-dependent inquiry" that "cannot narrowly focus on whether the threat solely to the first victim has been neutralized because the threat to the first responders and public may continue." *Id.* at 363. Additionally, "whether an ongoing emergency exists is simply one factor—albeit an important factor—that informs the ultimate inquiry regarding the 'primary purpose' of an interrogation." *Id.* at 366. Courts should also consider "*informality* in an encounter between a victim and police" because "formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Id.* at 366 (emphasis in original, internal citation omitted).

The Michigan Court of Appeals reasonably applied this test to conclude that the twins' statements to Detective Teets and Deputy Hause were nontestimonial because they were made to law enforcement during the course of an ongoing emergency, and not for the purpose of initiating a prosecution. The court of appeals reasoned that the conversation between the four-year-old twins

and the officers responding to the 911 call was an "informal encounter," and that "just like the officers in *Michigan v. Bryant*, the officers in this case 'did not know why, where, or when' the crime had been committed." *Harrison*, 2016 WL 5328694, at *3 (citing *Bryant*, 562 U.S. at 375–376). Likewise, the court of appeals reasoned that Stevens' statements when she called 911 were non-testimonial because she was reporting an ongoing emergency, namely, that "the victim had recently been stabbed eleven times and was bleeding to death with her four-year-old twins standing over her and begging her not to die." *People v. Harrison,* 2016 WL 5328694, at *4.  That reasoning is entirely consistent with federal law. *See* 28 U.S.C. § 2254(d).

Finally, this Court notes that the victim's sons were four years old. "Statements by very young children will rarely, if ever, implicate the Confrontation Clause." *Ohio v. Clark*, 135 S. Ct. 2173, 2182 (2015). The rationale behind this is that "[f]ew preschool students understand the details of our criminal justice system." *Id.* Therefore it "is extremely unlikely" that a 4-year-old in the twins' "position would intend his statements to be a substitute for trial testimony." *Id.*

Even assuming that the admission of the twins' statements to Detective Teets and Deputy Hause violated Harrison's right to confrontation, this Court agrees with the Michigan Court of Appeals that any error was harmless. "Confrontation Clause violations do not require automatic reversal, and are instead subject to harmless-error analysis." *Reiner v. Woods*, 955 F.3d 549, 555 (6th Cir. 2020). This means "the error must have had a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (citing *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). To determine whether a Confrontation Clause violation is harmless on habeas review, a court considers: "(1) the importance of the witness' testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross examination otherwise

permitted; and (5) the overall strength of the prosecution's case." *Jensen v. Romanowski,* 590 F.3d 373, 379 (6th Cir. 2009) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)); *see also Reiner*, 955 F.3d at 557.

The Michigan Court of Appeals weighed these factors and reasonably concluded that the admission of the twins' statements to Detective Teets and Deputy Haus was harmless in light of the compelling evidence of Harrison's guilt, including "his statement, the blood found on his shoes, pants, and tank top, his threatening letters, his argument with the victim shortly before the murder, and other evidence placing him at the scene," all of which were consistent with the twins' statements. *See Harrison*, 2016 WL 5328694, at *4.

For the same reasons, this Court agrees that any error in the admission of these statements was harmless. The Court finds no basis to conclude that that Michigan courts acted contrary to federal law or relied on an unreasonable determination of the facts. *See* 28 U.S.C. § 2244(d)(1), (2). Accordingly, the Court cannot grant habeas relief based on improper admission of witness statements against Harrison. *See Davis v. Ayala*, 576 U.S. 257, 269 (2015).

### 3. Ineffective Assistance for the Hearsay Claim

Harrison also asserts that his trial counsel was ineffective for failing to object to the admission of Detective Teets' and Deputy Hause's testimony.

To establish ineffective assistance of counsel, a petitioner must show two things. First, that counsel's performance was "deficient," involving "an error so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The defendant must overcome a strong presumption that counsel's behavior lies within the wide range of reasonable professional assistance. *Id*. Put differently, Harrison must overcome the presumption that counsel's action might have been sound

11

trial strategy. *Id.* at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. at 687. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Harrison bears the burden to show ineffective assistance of counsel. *Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

Because the admission of the twins' statements to Detective Teets and Deputy Hause did not violate the Confrontation Clause, this court concludes that counsel was not ineffective for failing to object on this basis. *See e.g.*, *U.S. v. Johnson,* 581 F.3d 320, 328 (6th Cir. 2009).  Even if the admission of the twins' statements to the police was, at worst, a harmless error, Harrison cannot show that it prejudiced the outcome of the case under *Strickland*. *See Bell v. Hurley*, 97 F. App'x 11, 17 (6th Cir. 2004).

### B.  *Miranda* Rights

Harrison next contends that the police violated his *Miranda* rights by interviewing him after he invoked his right to remain silent. He also claims his statement was involuntary because it was made more than 72 hours after he had been arrested but before he had been brought before a magistrate to be arraigned. Harrison argues that trial counsel was ineffective for failing to move to suppress his statement.

### 1.  Legal Standard

*Miranda v. Arizona* held that if a defendant makes a statement during custodial interrogation, a prosecutor may not use that statement unless the prosecutor can show procedural safeguards were used to protect the defendant's Fifth Amendment right against self-incrimination. 384 U.S. 436, 444 (1966). The defendant must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the

presence of an attorney. *Id.* A defendant may waive these rights, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* A defendant controls the waiver; he may terminate the conversation at any time. "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease" because "at this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Id.* at 474.

## 2. Harrison's Statements to Police

Harrison was arrested on September 27, 2013, at approximately 4:00 p.m. An hour and a half later, at approximately 5:30 p.m. that same day, Chief of Police Everette Robbins, a detective at the time, interrogated Harrison at the detective bureau. (ECF No. 15-13, PageID.568–569.)[1] Harrison was advised of his *Miranda* rights and told Detective Robbins that he did not want to talk. *Id.* Detective Robbins concluded the conversation.

Robbins visited Harrison three days later, on September 30, 2013, to obtain a DNA swab from him. At that point, Harrison had been held for 72 hours without being brought before a magistrate. At trial, Robbins testified that Harrison asked about Turner, and Robbins informed Harrison that she was dead. Harrison told Robbins "she was his heart" and "the kids were his heart," and he asked what the victim's father thought had happened. (ECF No. 15-9, PageID.392.) Robbins testified that Harrison wanted to ask more questions. Robbins informed Harrison that the conversation would have to be recorded and would have to be "through *Miranda*." (*Id.*)

---

[1] The transcript of the interrogation on September 27, 2013, and the subsequent interrogation on September 30, 2013, are attached as an exhibit to Harrison's brief to the Michigan Court of Appeals. (*See* ECF No. 15-13, PageID.568–594). They are not filed separately as part of the Rule 5 materials in this case.

Robbins escorted Harrison to the sheriff's department for the interrogation. (ECF No. 15-13, PageID.570–594.). At the time of the interrogation, Robbins did not know whether Harrison had been formally charged or whether Harrison knew what charges he was facing, or whether he had talked to a lawyer. (ECF No. 15-9 at 393.) Harrison was not arraigned until October 1, 2013, having been held for approximately 96 hours.

Before he began the interrogation, Detective Robbins advised Harrison of his *Miranda* rights. (ECF No. 15-13, PageID.570–572.) Detective Robbins explained to Harrison that he was agreeing to a "waiver of rights," but that he could "stop talking any time you want to stop talking." (*Id.* at 572.) In his recorded statement, Harrison said it was "Correct" that he initiated the conversation with Detective Robbins and "asked [Robbins] to come up here and talk." (*Id.* at 571.) Harrison also acknowledged that Robbins had merely come to obtain a DNA sample and had not asked him any questions about the night of the murder. (*Id.*)

Harrison then told Robbins that he had an argument with Turner, his girlfriend, a few days after he was released from prison. (ECF No. 15-13, PageID.571–594.) Each accused the other of cheating. (*Id.* at PageID.581–592.) As the argument escalated, Harrison tried to pack his belongings and leave. (*Id.* at PageID.588–589.) Turner attempted to undress Harrison and rubbed a knife on his chest—whether this was intended as seduction or a threat is unclear from the record. (*Id.*) Harrison tried to leave. (*Id.* at PageID.589.) Turner shredded the plastic bag he had to carry his clothes. (*Id.* at PageID.589–590.) She tore up his papers and personal photos. (*Id.* at PageID.589–593.) Harrison stated that Turner started hitting him, first with a lamp, and then threw beer bottles at him. (*Id.* at PageID.592–593.). Harrison stated that she threatened to call the police and send him back to prison. (*Id.* at PageID.588, 592–594.) Harrison told Detective Robbins that he had never seen her act that way and that he begged her not to call the police. (*Id.*) The fight

14

escalated. Harrison and Turner each believed the other had ruined the family they wanted together. (*Id.* at PageID.593–594.) Harrison then told Detective Robbins that he did not want to say anything more, and the detective concluded the interview. (*Id.* at PageID.594.) At trial, Detective Robbins testified that afterwards, he came back into the room and asked Harrison if he meant to kill Turner. (ECF No. 15-2, PageID.185.) Detective Robbins testified that Harrison "just said the word, 'No.'" (*Id.*) All of Harrison's statements were recorded during the interview and then played for the jury. (ECF No. 15-9, PageID.392.)

On direct appeal, Harrison argued that the admission of his statements to Detective Robbins violated his *Miranda* rights. The Michigan Court of Appeals disagreed, reviewing the record and finding that Harrison's statements to Detective Robbins were "knowingly, voluntarily, and intelligently made" and that despite the delay in Harrison's arraignment, "nothing in the record reflects any intimidation, coercion, or deception." (*Id.*). *People v. Harrison*, 2016 WL 5328694, at *5. Harrison now raises the same argument here.

### 3. Analysis

To evaluate an argument that an involuntary confession violated due process, federal courts consider the totality of circumstances. *Withrow v. Williams*, 507 U.S. 680, 689 (1993). These include police coercion (a "crucial element"), the length of interrogation, the location of interrogation; the continuity of the interrogation, the defendant's maturity; the defendant's education; the defendant's physical condition and mental health; and whether police advised the defendant of the right to remain silent and to have counsel present during interrogation. *Id.* at 693–94.

The Michigan Court of Appeals followed precisely this approach in evaluating Harrison's claim on direct appeal and concluded that Harrison's statement was reasonable: (1) Detective

Robbins advised Harrison of his *Miranda* rights when he was initially arrested on September 27, 2013 (*see* ECF No. 15-13, PageID.568–569), (2) Detective Robbins immediately ceased speaking with Harrison when he invoked his right to remain silent at that first attempted interview (*id.*), (3) Detective Robbins only resumed questioning after a significant period of time and only after Harrison initiated the conversation that led to his potentially incriminating statements during the interview on September 30, 2013 (*see* ECF No. 15-13, PageID.571–572), and (4) Detective Robinson reminded Harrison of his *Miranda* rights before starting the second interview (*id.*). *Harrison*, 2016 WL 5328694, at *5.

That reasoning is entirely consistent with controlling federal law. Harrison does not explain how the decision by the Michigan Court of Appeals was contrary to, or involved an unreasonable application of, clearly established federal law, or how any of its analysis might be based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1), (2).

To emphasize this point, the Court will further address Harrison's two specific objections: that officers could not question him again after he invoked *Miranda* on the night of his arrest, and that the 96-hour delay in his arraignment rendered his statements involuntary. Neither of these arguments are supported by federal law.

### a. The Second Round of Questioning

First, Harrison argues that because he invoked the right to remain silent the first time that Detective Robbins questioned him, the night that he was arrested, any statements he made from that point forward were involuntary.

But a voluntary initiation occurs "when, without influence by the authorities, the suspect shows a willingness and a desire to talk generally about his case." *Davie v. Mitchell*, 547 F.3d 297, 305 (6th Cir. 2008) (quoting *United States v. Whaley*, 13 F.3d 963, 967 (6th Cir. 1994)). And

Harrison does not dispute that, three days later, he himself initiated a conversation with Robbins and then chose to be interviewed after receiving a new *Miranda* warning. The record and the Michigan Court of Appeals' analysis fully support that conclusion.

Further, the admissibility of statements obtained after a criminal suspect has invoked his or her right to remain silent depends on whether the police "scrupulously honored" the "right to cut off questioning." *Michigan v. Mosley*, 423 U.S. 96, 104 (1975). Where police "scrupulously honor" the defendant's right to remain silent, there is no per se prohibition to the resumption of questioning after the invocation of the right to silence, and a suspect may be approached again later to seek a waiver. *See id.* at 104–05; *Davie*, 547 F.3d at 309–11.

Harrison's case bears close similarity to *Davie v. Mitchell*, where a defendant cut off questioning with law enforcement twice before initiating contact for a third conversation and confessing to the crime. 547 F.3d at 309–11. The Sixth Circuit concluded that the defendant effectively asserted but then waived his *Miranda* rights because, each time, authorities properly advised him of his *Miranda* rights, he expressed his understanding of those rights, and "[a] review of the record indicates that [the defendant's] right to cut off questioning was fully respected." *Id.* at 309. As a result, the Sixth Circuit concluded that the state courts reasonably ruled that his statements were voluntary and their admission at trial did not warrant habeas relief. *Id.* at 311.

Neither the Fifth Amendment nor any U.S. Supreme Court precedent interpreting that Amendment barred Detective Robbins from asking Harrison to discuss the case after Harrison asked him about Turner and "what happened." As recounted above and as noted by the Michigan Court of Appeals, Detective Robbins reminded Harrison of his *Miranda* rights before starting the second interview, and Harrison stated that he understood he was agreeing to a waiver of his rights.

(ECF No. 15-13, PageID.571–572.) So the entire conversation until Harrison asked to stop the interview was admissible.

The only portion of Harrison's statement that was arguably inadmissible was his last statement, after Harrison asked to stop the interview. The unofficial interview transcript ends with Harrison stating, "Don't want to talk no more," and Detective Robbins responding, "All done? Conclude the interview. It's now 4:13." (ECF No. 15-13, PageID.594). At the preliminary examination, Robbins testified that after Harrison said he did not want to talk anymore, he stopped the interrogation but then came back into the room and asked Harrison if he meant to kill Turner. (ECF No. 15-2, PageID.185.) He testified that Harrison "just said the word, 'No.'" (*Id.*)

It is not clear from the trial court record whether this portion of Harrison's statement was admitted into evidence, but Robbins testified that the audio recording was still running, and the audio recording of the interrogation was played for the jury. (ECF No. 15-9, PageID.392.) So most likely, this exchange after the termination of the interview was played for the jury.

Assuming that Harrison's last statement was improperly admitted into evidence in violation of his *Miranda* rights, the Court finds that any such error was harmless. The admission of evidence obtained from a suspect in violation of *Miranda* is considered harmful only if it has a substantial and injurious effect in determining the jury's verdict. *See Kyger v. Carlton*, 146 F. 3d 374, 381–82 (6th Cir. 1998). In light of the overwhelming evidence that Harrison was the person who stabbed Turner—detailed above in Part IV(A)—the admission of Harrison's statement to Detective Robbins that he did not intend to kill Turner did not have a substantial or injurious influence or effect on the jury's verdict. *Id.*

### b.    The Delay Between Arrest and Arraignment

Harrison also argues that his entire statement to Detective Robbins should have been suppressed because of the 96-hour delay between his arrest and his arraignment, and the 72-hour delay between his arrest and the second interview. Harrison contends that the unreasonable delay allowed police to exploit his isolation and lack of information about whether Turner had survived, making his statements involuntary.

A delay between arrest and confession, or between arrest and arraignment, does not alter the totality-of-circumstances analysis. *United States v. Williams*, 612 F.3d 417, 420–21 (6th Cir. 2010) (explaining that although a period of confinement between arrest and confession of even 24 hours "[t]aken by itself . . . might begin to support" an argument that a confession was involuntary, the correct test is the "totality-of-circumstances.").

 The Michigan Court of Appeals considered and rejected Harrison's argument, based on undisputed evidence that Harrison initiated the second interview with Detective Robbins, that the detective reminded Harrison of his *Miranda* rights before he began questioning, that Harrison expressly stated that he understood those rights and wanted to proceed, and that Harrison had prior experience with the criminal justice system. (ECF No. 15-13, PageID.470–471; 571–572.) The Michigan Court of Appeals concluded that, even acknowledging Harrison's contention that approximately 72 hours passed between his arrest and confession and his contention that approximately 96 hours passed between his arrest and arraignment, "nothing in the record reflects any intimidation, coercion, or deception." *People v. Harrison*, 2016 WL 5328694, at *5. (ECF No. 15-13, PageID.471.)

This was not an unreasonable application of or contrary to any U.S. Supreme Court holding. Based on a review of the record, it was reasonable to conclude from the totality of

circumstances that Harrison's confession was voluntary, regardless of the pre-arraignment delay: Harrison was advised of his *Miranda* warnings, Harrison stated that he understood he was agreeing to a waiver of rights when the second interview began, and there is no evidence of intimidating, coercive, harassing or otherwise improper police conduct. *See, e.g.*, *United States v. Williams*, 612 F.3d 417, 421 (6th Cir. 2010) (finding state prisoner's confession voluntary despite 24-hour delay between arrest and confession, where defendant chose to stop and start the conversation, officers gave defendant *Miranda* warnings four times and defendant orally waived them each time, defendant signed a waiver form three times, and there was no evidence of police coercion); *Davis v. Jones*, 306 F. App'x 232, 237–38 (6th Cir. 2009) (finding state appellate court's ruling that 96-hour delay in arraignment did not render statement involuntary where "under the totality of the circumstances, defendant's decision to give a second statement was the product of a free and deliberate choice" was not contrary to clearly established law).

### 4.  Ineffective Assistance for the *Miranda* Claim

In light of the foregoing, there was no reasonable probability that a motion to suppress Harrison's statements based on an alleged *Miranda* violation or because it was involuntary would have succeeded in this case. Harrison was therefore not denied effective assistance by his trial counsel's failure to move for the suppression of his statement on that basis. *See Koras v. Robinson*, 123 F. App'x 207, 210–12 (6th Cir. 2005).

### C.  Evidence of Prior Incarceration

Harrison next claims that the trial court denied him a fair trial by allowing the prosecutor to admit evidence of Harrison's prior incarceration. He argues that this evidence was irrelevant, more prejudicial than probative, and offered simply to show his propensity to commit criminal acts.

Again, as a general rule, "state law evidentiary errors are not cognizable on federal habeas review." *Hall v. Vasbinder*, 551 F. Supp. 2d 652, 676 (E.D. Mich. 2008) (citing *Estelle v. McGuire*, 502 U.S. 62, 70 (1991)), *rev'd on other grounds*, 563 F.3d 222 (6th Cir. 2009). The Supreme Court has explained that "the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial . . . But it has never been thought that such cases establish this Court as a rulemaking organ for the promulgation of state rules of criminal procedure." *Spencer v. Texas*, 385 U.S. 554, 563–64 (1967).

Harrison's claim that this evidence should have been excluded under Michigan Rule of Evidence 403 for being more prejudicial than probative does not merit habeas relief. The Sixth Circuit has explained: "[t]he Supreme Court has never held (except perhaps within the capital sentencing context) that a state trial court's admission of *relevant* evidence, no matter how prejudicial, amounted to a violation of due process." *Blackmon v. Booker*, 696 F.3d 536, 551 (6th Cir. 2012).

The Michigan Court of Appeals found that Harrison's letters to Turner while he was incarcerated were relevant evidence of his motive under Michigan law because they included threats that there would be a "price to pay" if she were unfaithful to him. *People v. Harrison*, 2016 WL 5328694, at *6. The Michigan Court of Appeals further noted that the jury was instructed not to consider that Harrison's prior conviction or incarceration was evidence of guilt in this case, and concluded that "the prejudicial effect, if any, was minimal in light of the context of the evidence and the other testimony in the record." *Id.* Indeed, Harrison's own narrative of the dispute between himself and Turner included reference to his recent release from prison and his relationship with Turner while he was in prison. (ECF No. 15-13, PageID.574–575.) This Court finds no grounds in the record or in federal law to find that determination unreasonable. Harrison's letters provided

relevant evidence of his potential motive, and so their admission was not a violation of due process. *See Blackmon*, 696 F.3d at 551.

And Harrison's claim that the state court violated Michigan Rule of Evidence 404(b) by admitting improper character evidence or evidence of prior bad acts is also not cognizable on habeas review. *See Bey v. Bagley,* 500 F. 3d 514, 519 (6th Cir. 2007) ("a claim that the state trial court erred in the application of state law, specifically a ruling on evidence . . . is simply not cognizable on habeas review"); *Estelle*, 502 U.S. at 72 (Supreme Court's habeas powers did not permit Court to reverse state court conviction based on their belief that the state trial judge erred in ruling that prior injury evidence was admissible as bad acts evidence under California law); *Dowling v. United States*, 493 U.S. 342, 352–53 (1990) (admission at defendant's bank robbery trial of "similar acts" evidence that he had subsequently been involved in a house burglary for which he had been acquitted did not violate due process).

And even if Harrison's objection under Rule 404(b) were cognizable on habeas review, the Michigan Court of Appeals reasonably concluded that the prejudicial effect here "if any, was minimal in light of the context of the evidence," and in light of the fact that the trial court gave a limiting instruction to the jury. *See Harrison*, 2016 WL 5328694, at *6; *Emerick v. Prelesnik*, 491 F. App'x 639, 644 (6th Cir. 2012) ("[t]he trial court's limiting instruction mitigated any potential risk of prejudice to Petitioner."). Because there is nothing in the record to suggest that the trial court's admission of the "prior bad acts" was contrary to or an unreasonable application of clearly established federal law, this claim does not entitle Harrison to habeas relief. *See id.* at 645 ("Because the trial court's admission of Petitioner's 'other acts' evidence was not prejudicial or offensive to 'some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' Petitioner cannot prove an unreasonable application of federal law

22

necessary to warrant habeas relief." (citing *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996); *Patterson v. New York*, 432 U.S. 197, 202 (1977)) (cleaned up))).

### D.  Prosecutorial Misconduct

Harrison next claims he was denied a fair trial because of prosecutorial misconduct. He argues that the prosecution acted improperly in three ways. First, he argues the prosecution wrongly "shifted the burden of proof" to the defense by "indirectly commenting" on the fact that Harrison chose not to testify. (ECF No. 16, PageID.812.) Second, Harrison argues the prosecution improperly appealed to the jurors' sympathies by repeatedly referring to the brutal nature of the murder. Third, he argues the prosecution improperly referred to Harrison's defense—that another person killed Turner and that DNA testing of cigarette butts in the apartment would reveal the identity of the true killer—as "a red herring."

Claims of prosecutorial misconduct are reviewed deferentially on habeas review. *Parker v. Matthews*, 567 U.S. 37, 45 (2012); *see also Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)). A prosecutor's improper comments will be held to violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). And "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'" Darden, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 642). To evaluate whether a prosecutor's comments deprived a petitioner of a fair trial, the Supreme Court considers multiple factors, including whether the comments (1) "manipulate or misstate the evidence," (2) "implicate other specific rights of the accused such as the right to counsel or the right to remain silent," (3) were "responsive . . . to the defense" in terms of "their effect on the trial as a whole," (4) whether the

trial court gave a curative jury instruction, and (5) the "weight of the evidence" against the petitioner. *Darden*, 477 U.S. at 181–182.

### 1.  Shifting the Burden of Proof

First, Harrison claims that the prosecutor improperly shifted the burden of proof to the defense and improperly commented on Harrison's right to remain silent when the prosecutor argued that if Harrison were innocent, he would have explained how his blood was found at the crime scene and proposed another suspect. Specifically, in rebuttal at closing arguments, the prosecutor stated, "[Harrison] never suggested or stated that there was someone else there when this happened or that he saw someone else commit this crime or give an accounting for how it is that his blood was left at the scene or how it is that her blood came to be on his person." The prosecution continued, "So he had that opportunity and he did not choose to use it.  So I think you can consider that as evidence that, if you were in that position, if you were Mr. Harrison and you were being asked by the police about that incident, I suggest that you would have given all the information that you had about the events of that night." (ECF No. 15-10, PageID.420.) The prosecutor also argued: "Four people knew what happened that night. One of them is dead, one of them is in this courtroom, and two of them are four-year-old boys." (*Id.*, PageID.421.)

The Michigan Court of Appeals rejected Harrison's claim:

> On appeal, defendant takes issue with the prosecutor's comments regarding his alleged failure to defend himself to law enforcement. This is not an accurate characterization of the record. The prosecutor argued to the jury, in response to defense counsel's claim that a third party was involved based on a variety of untested evidence, that defendant's actions did not reflect those of an innocent bystander. Indeed, the prosecutor expressly explained that, while defendant was not required to make a statement, the jury was permitted to consider the statement that defendant did make. We discern no misconduct in this regard. In any event, even if we assume that the prosecutor's comments relating to defendant's partial silence were improper, any error was presumptively cured by the trial court's jury instructions, and defendant makes no effort to overcome that presumption.

*People v. Harrison,* 2016 WL 5328694, at *7 (internal citation omitted).

This is another merits determination by the Michigan courts in which the Court sees nothing contrary to federal law and no unreasonable consideration of the facts. The Fifth Amendment bars the prosecution from commenting on a defendant's choice not to testify at trial. *Griffin v. California*, 380 U.S. 609, 614 (1965). And if a prosecutor "on his own initiative asks the jury to draw an adverse inference from a defendant's silence, *Griffin* holds that the privilege against compulsory self-incrimination is violated." *United States v. Robinson*, 485 U.S. 25, 32, (1988). "But where . . . the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, we think there is no violation of the privilege." *Id.*

In Harrison's case, the prosecutor was entitled to point out that Harrison offered no evidence to support his theory that someone else killed Turner because it was a fair response to the defense's argument. *See, e.g.*, *Robinson*, 485 U.S. at 32 (declining to "prohibit the prosecutor from fairly responding to an argument of the defendant by adverting to that silence"); *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005)  ("[T]he prosecutor's comments on the absence of supporting evidence did not improperly highlight Forrest's failure to take the stand himself."); *United States v. Beverly*, 369 F.3d 516, 544 (6th Cir. 2004) (finding that prosecutor's comment, "Why [defendant] did what he did, only he can answer" was "completely proper for the prosecutor to counter defense counsel's seemingly plausible theory that [defendant] would not have stayed in the area, had he actually been guilty of the robberies")

True, such comments should not "improperly highlight [a defendant's] failure to take the stand." *Forrest*, 402 F.3d at 686. But it is not entirely clear whether the prosecutor was referring to Harrison's interview with Detective Robbins or his silence at trial when he stated that Harrison "had that opportunity [to explain what happened] and he did not choose to use it." (ECF No. 15-

10, PageID.420.) But even assuming that the prosecution did intend to comment on Harrison's choice not to testify, and that the jury interpreted the remark this way, the overwhelming evidence of Harrison's guilt weighs heavily against finding that the isolated comments—made only at one point during closing arguments—rendered Harrison's trial fundamentally unfair. The trial court also gave limiting instructions to the jury, curing any potential unfairness. *Harrison*, 2016 WL 5328694, at *7; *see also Webb*, 586 F.3d at 396 ("The trial judge also mitigated any harm from White's comment by instructing the jury on Webb's Fifth Amendment rights during his general instructions to the jury."). The prosecutor's comments on Harrison's testimony did not render his trial fundamentally unfair and therefore do not entitle him to habeas relief.

### 2.  Appealing to Jurors' Sympathy

Second, Harrison argues that the prosecutor improperly appealed to the sympathy of the jury when he repeatedly called Turner's death "horrifying" and "a horror story," emphasized that she suffered "the worst way to die," and that her small children witnessed her death. (ECF No. 15-10, PageID.410–412, 415–416.) The prosecutor made these comments throughout closing arguments. (*Id.*)

These comments did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181.

First, the statements were arguably not improper. While these statements were made deliberately and might have some persuasive power with a jury, they did not "manipulate or misstate the evidence," or otherwise mislead the jury. *See id.*; *see also Davis v. Burt*, 100 F. App'x 340, 348 (6th Cir. 2004). They also did not implicate Harrison's constitutional rights at trial. *See id.*

It might be arguable here that the prosecutor's editorial statement that Turner's death was "horrifying" or "the worst way to die" had some prejudicial effect and exceeded the facts in the record to the extent that he speculated about Turner's thoughts and feelings during the crime. *See Stanton v. Vasbinder*, No. 06-10432, 2009 WL 996955, at *9 (E.D. Mich. Apr. 13, 2009) (finding prosecutor's comments that victim "must have known she was going to die," that she probably "pleaded" with the defendant, and that she "suffered even after her face was blown apart because she survived the gunshots" were "based on facts not in evidence, insofar as they speculated on the victim's thoughts and feelings during the crime.").

But even assuming that the prosecutor's statements were improper, the Michigan Court of Appeals found, consistent with federal law, that the statements were minimally prejudicial and any prejudice was cured by the trial court's jury instruction not to allow prejudice or sympathy to affect the decision. (ECF No. 15-10, PageID.242); *Harrison*, 2016 WL 5328694, at *8; *Darden*, 477 U.S. at 182; *Stanton,* 2009 WL 996955, at *9. Considering these factors along with "the total strength of the evidence" against Harrison, which includes Harrison's statements to Detective Robbins, the testimony of the twin boys and the neighbor, and the extensive forensic evidence of a trail of blood through Turner's apartment that included both Turner's and Harrison's DNA (*see* ECF No. 15-10, PageID.410–416), the Michigan Court of Appeals reasonably concluded that the prosecutor's remarks did not deprive Harrison of his constitutional right to a fair trial. *See Darden*, 477 U.S. at 181–182; *Stanton,* 2009 WL 996955, at *9.

### 3.  Describing Harrison's Defense as a "Red Herring"

Finally, Harrison argues that the prosecutor improperly distracted the jury by referring to Harrison's defense—that another person killed Turner and that DNA testing of cigarette butts in

27

the apartment would reveal the identity of the true killer—as "a red herring." (*See* ECF No. 15-10, PageID.419–420.)

The Michigan Court of Appeals disagreed, reasoning that while "the term 'red herring' may carry a negative connotation, referring to certain defense theories as 'red herrings' is 'a fair argument regarding what the jury should believe,'" and "any error was presumptively cured by the trial court's jury instructions." *Harrison*, 2016 WL 5328694, at *8 (citations omitted).

That reasoning is consistent with federal law. As *Darden* explains, if "the objectionable content was invited by or was responsive to . . . the defense," that does not automatically excuse improper comments but does color "the effect [of the prosecutor's comments] on the trial as a whole." *Darden*, 477 U.S. at 182. Considering similar claims, the Sixth Circuit has repeatedly declined to find the term "red herring" or similar language is improper. *See Key v. Rapelje,* 634 F. App'x 141, 149 (6th Cir. 2015) (holding that prosecutor's characterization of defense's argument as a "smoke screen" or "octopus beclouding surrounding water" was "just that: the prosecutor's characterization of the defendant's evidence" and not prosecutorial misconduct) (alteration removed); *United States v. Burroughs,* 465 F. App'x. 530, 535 (6th Cir. 2012) (finding that prosecutor's statement during closing argument, that defendant possessed both firearms and ammunition, and "the rest of it" was "excuses and red herrings" was not prosecutorial misconduct; it did not denigrate defense counsel and merely "highlighted most damning evidence against [the defendant]"). In *Burroughs*, the Sixth Circuit further emphasized that the words "excuses and red herrings" were "reasonable arguments designed to persuade the jury to believe the prosecutor's theory of the case." *Id.* "A prosecutor may argue all reasonable inferences that may be drawn from the evidence admitted at trial as they relate to the prosecutor's case." *Id.* (citing *United States v. Francis*, 170 F.3d 546, 551 (6th Cir. 1999)).

It was reasonable for the Michigan Court of Appeals to conclude that the term "red herring" was a fair response to the defense's argument, and that, considering the overwhelming evidence against Harrison and the trial court's curative jury instructions, calling Harrison's defense a "red herring" did not deprive him of a fair trial. *See Harrison*, 2016 WL 5328694, at \*8. Even if the prosecutor's comments about Harrison's defense were improper—which they were not—the trial court cured any prejudice by instructing the jury that attorneys' arguments were not in evidence (*see* ECF No. 15-10, PageID.242), the comment did not tend to mislead the jury, and the evidence against Harrison was substantial. *See Darden*, 477 U.S. at 181–182; *Millender*, 376 F.3d at 528. Harrison's prosecutorial misconduct claim does not succeed on any of the theories he raises here.

### 4. Ineffective Assistance for Prosecutorial Misconduct

Harrison therefore cannot maintain an ineffective assistance of counsel claim based on prosecutorial misconduct. To show prejudice under *Strickland* for failing to object to prosecutorial misconduct, a habeas petitioner must show that but for the alleged error of his or her trial counsel in failing to object to the prosecutor's improper questions and arguments, there is a reasonable probability that the proceeding would have been different. *Hinkle v. Randle*, 271 F. 3d 239, 245 (6th Cir. 2001). Because this Court finds that the Michigan Court of Appeals reasonably concluded that none of the prosecutor's comments deprived Harrison's of a fundamentally fair trial, Harrison cannot establish that he was prejudiced by his counsel's failure to object to these remarks. *See Slagle v. Bagley*, 457 F. 3d 501, 528 (6th Cir. 2006).

### E. The Bindover Order

A brief explanation of Michigan criminal procedure will assist in understanding Harrison's next claim. In Michigan, a criminal defendant charged with a felony has a statutory right to a preliminary examination before a magistrate judge before the prosecutor files an information in

the circuit court that will preside over the remainder of the case. *People v. Glass*, 627 N.W.2d 261, 267 (2001) (citing Mich. Comp. Laws § 767.42). The primary function of a preliminary examination is to determine if a crime has been committed and, if so, if there is probable cause to believe that the defendant committed it. *Id.* (citing *People v. Bellanca*, 194 N.W.2d 863, 864 (1972)). The preliminary examination functions as a type of probable cause hearing. If the magistrate determines from the preliminary examination "that a felony has been committed and that there is probable cause for charging the defendant with committing a felony," the magistrate "shall forthwith bind the defendant to appear within 14 days for arraignment before the circuit court of that county . . ."  Mich. Comp. Laws § 766.13. The resulting "bindover" order allows the prosecution to proceed in the presiding circuit court.

In his fifth claim for relief, Harrison argues that he was denied due process when the state trial court denied his motion to quash the bindover order and dismiss the charging information at the outset of his case because the testimony of the twin boys at the preliminary examination was insufficient to bind him over for trial. Harrison further argues that his trial counsel was ineffective for failing to file an interlocutory appeal after the trial judge denied the motion to quash.

Harrison has not identified a clearly established federal law that would contradict the adjudication of his preliminary examination or the bindover order. "The bind-over decision itself invokes a question of state law, which is not cognizable on habeas corpus review." *Redmond v. Worthinton*, 878 F. Supp. 2d 822, 844 (E.D. Mich. 2012) (citing *Estelle*, 502 U.S. at 67–68; *Dorchy v. Jones*, 320 F. Supp. 2d 564, 578–79 (E.D. Mich. 2004), *aff'd*, 398 F.3d 783 (6th Cir. 2005)). As the court explained in *Dorchy*, because "the federal Constitution does not require that a probable cause hearing be conducted prior to a criminal trial . . . the bind-over decision constitutes a state-law issue which does not implicate a federal constitutional right and is not subject to review in a

30

habeas proceeding." *Dorchy*, 320 F. Supp. 2d at 578 (citing *Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) ("A prior judicial hearing is not a prerequisite to prosecution by information."); *Schacks v. Tessmer*, No. 00–1062, 2001 WL 523533, *6 (6th Cir. May 8, 2001) (refusing to review a state court determination that second-degree murder conviction rendered bind-over sufficiency-of-the-evidence challenge moot). Because no federal constitutional right is implicated by the bindover decision, Harrison cannot maintain a claim for habeas relief.

Harrison further argues that trial counsel was ineffective for failing to file an interlocutory appeal after the trial judge denied the motion to quash the information. Even if his trial counsel performed deficiently by failing to file an interlocutory appeal, Harrison cannot show that he was prejudiced by the bindover decision because the trial court ultimately addressed the sufficiency of the evidence at trial. *See Harrison*, No. 327708, 2016 WL 5328694, at *8 ("Because [Harrison] was 'fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover,' and we see no need to address such an argument any further.") (citing *People v. Wilson*, 677 N.W.2d 29 (Mich. 2004) ("If a defendant is fairly convicted at trial, no appeal lies regarding whether the evidence at the preliminary examination was sufficient to warrant a bindover."). Harrison cannot show that he was prejudiced by his trial counsel's failure to file an interlocutory appeal. As a result, he cannot maintain that he received ineffective assistance of counsel.

### F.  DNA Testing and a New Trial

In his sixth and final claim, Harrison argues that the trial court abused its discretion when it denied Harrison's motion for a new trial based on a request for DNA testing of cigarette butts found at the victim's home as well as a blood stain found in the upstairs area of the home that was never tested by the prosecution. (ECF No. 16, PageID.824–826.) He argues that the prosecutor had

31

a duty to conduct the testing under *Brady v. Maryland*, 373 U.S. 83 (1963) and under Michigan

Compiled Law 770.16(3)(a). On July 23, 2020, Harrison submitted a supplemental brief to this

Court, attaching laboratory reports from the Michigan State Police that were prepared in 2013 and

2014 following Turner's death and a transcript from a pre-trial hearing on May 5, 2014. (ECF No.

25.) At that hearing, the trial court granted Harrison's request to conduct DNA testing of three

shirts found at the residence. (ECF No. 25, PageID.930.) In his new supplemental brief, Harrison

states that testing from prints in Turner's bedroom "resulted in three persons of interest." (*Id.*,

PageID.880.) He argues that the State has refused to release relevant DNA evidence collected from

Turner's home, in violation of his rights. (*Id.*, PageID.882.)

It is not fully clear whether Harrison is arguing that prosecutors had exculpatory evidence

and withheld it, as prohibited by *Brady*, or if he is arguing that prosecutors refused to conduct

testing that might have produced potentially exculpatory evidence. But neither of these arguments

entitles Harrison to habeas relief.

On direct appeal, the Michigan Court of Appeals affirmed the trial court's ruling. Under

Michigan law, a trial court may order a new trial on defendant's motion "on any ground that would

support appellate reversal of the conviction" or "because it believes that the verdict has resulted in

a miscarriage of justice." Mich. C. R. 6.431(B). The Michigan Court of Appeals found no grounds

for appellate reversal, finding no merit to Harrison's arguments regarding the twins' statements,

Steven's 911 call, and the prosecutors' conduct. *Harrison*, 2016 WL 5328694, at *9. The court

also rejected Harrison's final argument, regarding the DNA evidence, because "defendant merely

speculates that testing these items might have been helpful to his case, and it is equally plausible

that these items would have reflected even further evidence of defendant's guilt." *Id.* "Furthermore,

he had an opportunity throughout the entirety of this case to test those items for DNA and chose not to. Thus, the trial court correctly denied defendant's new-trial motion." *Id.*

This was a reasonable conclusion, entirely consistent with federal law. *Brady v. Maryland* established that suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. 373 U.S. at 87. To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the State suppressed the evidence, "either willfully or inadvertently"; and (3) "prejudice . . . ensued." *Skinner v. Switzer*, 562 U.S. 521, 536 (2011) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)); *see also Banks v. Dretke*, 540 U.S. 668, 691 (2004)). Favorable evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Hamblin v. Mitchell*, 354 F.3d 482, 495 (6th Cir. 2003) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). But even accepting Harrison's premise that DNA evidence might identify a different person who stabbed Turner on the night of Harrison and Turner's fight, Harrison does not allege that prosecutors or police had specific evidence in their possession that they failed to produce before trial. Indeed, addressing this claim, the Michigan Court of Appeals clarified that before trial, the court granted multiple requests from Harrison for DNA testing (ECF No. 15-13, PageID.496, 518), including a motion to adjourn trial to allow more time to conduct testing, "but, after the motion was granted, defendant failed to utilize that opportunity." *People v. Harrison*, 2016 WL 5328694, at *8. And Harrison did not request DNA testing for the cigarette butts and other items until after the jury reached a verdict. *Id.*

33

Considering the Michigan courts' treatment of the facts, nothing in the record suggests an unreasonable application of the facts. The Court discerns no evidence that the prosecution or the trial court prevented Harrison from seeking DNA testing before trial. He has not shown any reasonable grounds to suspect that the state suppressed evidence and thus cannot assert a *Brady* claim. And even if Harrison alleged that the prosecution had DNA results for the cigarette butts or other items in its possession, those results would have only "speculative materiality"; given the substantial evidence that Harrison was the person who stabbed Turner to death, the Court cannot find "a reasonable probability" that, had that hypothetical evidence been disclosed to the defense, "the result of the proceeding would have been different." *See Hamblin v. Mitchell*, 354 F.3d 482, 496 (6th Cir. 2003) (finding no *Brady* violation where State failed to turn over ballistics results that showed defendant's clothes were negative for gunshot residue, reasoning that "given that the evidence of defendant's guilt is substantial, we cannot find that a 'reasonable probability' exists that the state's failure 'undermines confidence in the outcome of the trial.'").

Alternatively, Harrison may intend to argue that the State violated his due process rights by failing to conduct DNA testing that would have been relevant to his case. But the record does not support that theory. The Court notes again that police conducted DNA testing on at least 11 items found at Turner's home. (ECF No. 25, PageID.898, 902–905.) But "the police do not have a constitutional duty to perform any particular tests." *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988); *see also Coy v. Renico*, 414 F. Supp. 2d 744, 777 (E.D. Mich. 2006). Indeed, the Due Process Clause is not violated simply because "the police fail to use a particular investigatory tool." *Youngblood*, 488 U.S. at 59. Additionally, the trial court granted Harrison's pretrial request for additional DNA testing of certain clothing (ECF No. 15-13, PageID.496, 518), and the trial court even granted a request to continue the trial to allow more time for DNA testing (ECF No.

34

25, PageID.929–931.) In other words, the trial court gave Harrison every opportunity to conduct DNA testing before his trial. Even if DNA results would have shown that an as-yet-unidentified person was present at Turner's house near the time of her death, Harrison was not prejudiced by lacking such information at the time of his trial, given the overwhelming evidence that he himself was present—including his own statements. *See Coy*, 414 F. Supp. 2d at 777–78 (finding habeas petitioner could not show prejudice resulting from trial court's denial of a continuance to conduct DNA testing to identify alternate suspects because "Petitioner has not demonstrated that a DNA test . . . would have resulted in any exculpatory evidence."). Harrison has not made any plausible allegation of deficient DNA testing. To the extent that his claim includes a concern that police failed to preserve certain evidence, that claim also falls short because Harrison does not make any allegation of bad faith by law enforcement. *See Youngblood*, 488 U.S. at 58 ("Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.").

In sum, Harrison has not shown any way that the trial court or the police prevented him from accessing relevant DNA evidence. The Michigan Court of Appeals' denial of his motion for a new trial and motion for additional DNA testing was not contrary to clearly established federal law and not based on an unreasonable determination of the facts. So Harrison is not entitled to habeas relief on his sixth claim.

## V.  CONCLUSION

Because the Court concludes that none of Harrison's claims for a writ of habeas corpus have merit, Harrison's petition for the writ (ECF No. 16) is DENIED.

Further, the Court believes that no reasonable jurist would debate whether Harrison should be granted habeas corpus relief on any of his claims. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, the Court DENIES Harrison a certificate of appealability.

If Harrison chooses to appeal the Court's decision, he may proceed in forma pauperis on appeal because an appeal could be taken in good faith. 28 U.S.C. § 1915(a)(3).

SO ORDERED.

Dated: November 9, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE